UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

| | |
|---|---|
| **UNITED STATES SECURITIES AND EXCHANGE COMMISSION,**<br><br>**Plaintiff,**<br><br>v.<br><br>**DAVID P. FORTE, JOHN D. YOUNIS, and GREGORY P. MANNING,**<br><br>**Defendants.** | CASE NO. 1:22-CV-10074<br><br>**COMPLAINT**<br><br>DEMAND FOR JURY TRIAL |

Plaintiff United States Securities and Exchange Commission ("Commission" or "SEC") alleges as follows:

### SUMMARY

1. This case involves insider trading in the securities of Linear Technology Corporation ("Linear") in advance of the July 2016 announcement that the company was merging with Analog Devices, Inc. ("Analog").

2. Defendant David P. Forte misappropriated material nonpublic information that he obtained about the acquisition from one of his brothers, who was then Analog's Chief Information Officer (hereinafter, "Analog's CIO" or Forte's "Brother").

3. In the days before the July 2016 announcement, Forte tipped his close friends Defendants John D. Younis and Gregory P. Manning, both of whom purchased Linear securities. Younis also recommended Linear stock to a business associate, who then purchased it. The traders collectively purchased over 30 Linear call options and thousands of shares of Linear stock in accounts they owned or controlled before the announcement.

4. On July 26, 2016, a news article reported rumors about a merger between Analog and Linear. Later that day, Linear and Analog issued a joint press release announcing the execution of the merger agreement. The stock closed at $62.49 after the merger was officially announced, which represented a 29% increase over the closing price of Linear's stock the previous day.

5. The next day, on July 27, 2016, the traders sold their Linear options and shares after news of the Linear-Analog merger became public, realizing total profits of more than $90,000. Manning then paid Forte several thousand dollars in cash in return for the tip.

6. As a result of the conduct alleged herein, Defendants violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

7. The Commission seeks a permanent injunction against Defendants, enjoining them from engaging in the transactions, acts, practices, and courses of business alleged in this Complaint, civil penalties pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-1], and such other relief as the Court may deem just and proper.

## JURISDICTION AND VENUE

8. This Court has jurisdiction over this action pursuant to Sections 21(d), 21(e), 21A, and 27 of the Exchange Act [15 U.S.C. §§ 78u(d)(1), 78u(e), 78u-1, and 78aa]. In connection with the conduct described herein, Defendants directly or indirectly made use of a means or instrumentality of interstate commerce, or of the mails, or of a facility of a national securities exchange.

9. Venue in the District of Massachusetts is proper pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa] and 28 U.S.C. § 1391(b)(1) and (2). Each of the Defendants

resides in the District and certain of the acts, practices, and courses of business constituting the violations of law alleged in this Complaint occurred within this District.

## COMMONLY-USED TRADING TERMS

10. A "call option" is a type of contract that gives the owner the right, but not the obligation, to buy 100 shares of the underlying security at a specified price within a specified time.

11. The "strike price" is the price per share at which the option owner can buy the underlying security if he chooses to exercise the option.

12. The "expiration date" is the last day that an option contract is valid. If the option owner chooses not to exercise the option (in other words, not to buy 100 shares of the underlying stock), the option expires and becomes worthless, and the owner loses the money he paid to buy the option.

## DEFENDANTS

13. **David P. Forte**, age 58, resides in Acton, Massachusetts. David Forte's Brother is Analog's former chief information officer. Forte is employed as a police officer and part-time landscaper. Forte entered into an agreement to toll or suspend the running of any statute of limitations for a period of six months.

14. **John D. Younis**, age 59, resides in Bristol, Rhode Island. He is the owner of a building company based in Wrentham, Massachusetts. Younis entered into an agreement to toll or suspend the running of any statute of limitations for a period of six months.

15. **Gregory P. Manning**, age 59, resides in Needham Heights, Massachusetts. Manning works as a senior accountant for a public healthcare technology company based in Massachusetts. Manning entered into an agreement to toll or suspend the running of any statute

of limitations for a period of six months.

## RELATED ENTITIES

16. **Linear** is a Delaware corporation with its headquarters in Milpitas, California. Linear designed and manufactured integrated circuits that were used in a variety of applications, including telecommunications, computers and aerospace. Prior to filing a Form 15-12B on March 20, 2017, Linear's common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act. During the time relevant to this investigation, Linear's common stock (LLTC) was listed on the NASDAQ stock market ("NASDAQ") and its options were traded on the Chicago Board Options Exchange and other U.S. options exchanges.

17. **Analog** is a Massachusetts company with its headquarters in Wilmington, Massachusetts. Analog manufactures integrated circuits and related products for use in a variety of applications. Analog's common stock is registered with the Commission pursuant to Section 12(b) of the Exchange Act.

## FACTS

**A.    Forte's Brother Learned Material Non-Public Information about the Merger.**

18. On April 5, 2016, Analog submitted a formal offer to Linear's executive chairman via email, and Analog's CEO called Linear's executive chairman on the telephone to inform him of the offer.

19. On April 6, 2016, Linear's executive chairman forwarded Analog's formal offer to a Linear director via email and discussed the formal offer with the director by telephone.

20. Over the next several weeks, Linear's management team and advisors continued engaging in discussions with Analog and a second bidder.

21. On June 22, 2016, Analog submitted a final offer to acquire Linear for $60 per

share.

22. On July 13, 2016, Linear's board of directors approved the company's entry into an exclusivity agreement with Analog with an exclusive negotiating period until July 26, 2016.

23. On July 26, 2016, at 2:23 pm EDT, a news article reported rumors of a merger between Analog and Linear. At 2:47 pm EDT, NASDAQ halted trading in Linear securities.

24. At 3:35 pm EDT, on July 26, 2016, Linear and Analog issued a press release announcing the merger agreement.

25. Linear's stock had closed at $48.47 per share on July 25, 2016. After news of the transaction became public on July 26, 2016, Linear's stock price reached a high of $64.42. The stock closed at $62.49 after the merger was officially announced. This represented a 29% increase over the closing price of Linear's stock the previous day.

26. Analog's CIO, Forte's Brother, first learned material nonpublic information that Analog was in negotiations to acquire Linear on June 22, 2016.

27. After learning of the proposed merger, Analog's CIO was involved in performing due diligence, planning for the integration of Analog's and Linear's IT systems, and coordinating IT resources for the announcement of the acquisition.

28. On Friday, July 15, 2016, Analog's project manager for the acquisition sent Analog's CIO and other executives a series of due diligence report templates and "synergy summaries" via email and instructed them to complete the reports and summaries by the following Monday, July 18.

29. The July 15, 2016 email said that, due to an "extremely tight schedule," the due diligence reports and summaries would "likely require work over the weekend."

30. On the afternoon of July 15, 2016, Analog's CIO participated in a telephone call

with Linear's CFO and corporate controller to discuss due diligence issues related to Linear's IT systems.

31. On July 18, 2016, Analog's CIO emailed completed due diligence reports for his business unit to Analog's CFO.

32. From July 19 through July 22, 2016, Analog's CIO continued working on due diligence related to the merger, and was also involved in supervising logistics for Analog executives to announce the Linear acquisition from San Jose, California the following week.

33. On July 20, 2016, Analog's CIO blocked out 90 minutes in his calendar for integration planning.

**B.      Forte Obtained Information about Linear's Merger from his Brother.**

34. At all relevant times, Forte and his Brother, the Analog CIO, shared a relationship of trust and confidence.

35. Based on their history, pattern, and practice of sharing confidences as brothers, Forte knew or reasonably should have known his Brother expected Forte to maintain the confidentiality of any material nonpublic information he obtained about the merger from his Brother.

36. As discussed above, on Friday, July 15, 2016, Forte's Brother (the Analog CIO) was tasked with several projects related to the merger, some of which had to be completed the following Monday.

37. On Sunday, July 17, 2016, Forte and his Brother spoke on the telephone for approximately nine minutes. Forte obtained material nonpublic information about the merger from his Brother on or about July 17, 2016.

38. As discussed in more detail below, approximately an hour after Forte's telephone

6

call with his Brother on July 17, 2016, Forte called Younis and tipped him to buy Linear stock.

39. A few days later, on Thursday, July 21, 2016, Forte called and spoke to his Brother on the phone twice. After the first call, Forte called Younis who then called his brokerage firm to try to get Linear call options trades that he had tried to place online approved.

40. Further, as provided below in greater detail, Forte tipped Manning to purchase Linear. Manning understood Forte to imply that there would be a merger and that the material nonpublic information had originated from Forte's Brother.

C. **Forte Tipped Younis about Linear's Merger.**

41. Forte, Younis, and Manning have been best friends since grade school, growing up together in Needham, Massachusetts.

42. The three friends were close and regularly traveled together, including taking a trip to Martha's Vineyard in the summer of 2016.

43. Younis knew Forte's Brother and knew that he was an executive at Analog.

44. As of July 2016, Younis had been trading options for around twenty years. Younis typically bought put options, but consistently lost money. From 2014 to until he made the purchases in July 2016, Younis had not purchased Linear stock or options.

45. In breach of the duty of trust and confidence Forte owed to his Brother, Forte misappropriated material nonpublic information about the Linear merger that he obtained from his Brother prior to Linear's and Analog's release of the information to the public. After obtaining material nonpublic information about the merger from his Brother, Forte tipped Younis about that information during conversations that took place before Younis purchased Linear securities in July 2016.

46. On July 17, 2016, approximately one hour after Forte spoke to his Brother, Forte

called Younis on the telephone.

47. According to Younis, Forte recommended that Younis buy Linear stock, describing it as a "good buy."

48. The next day, July 18, 2016, Younis deposited $60,000 into his brokerage account. The account had been dormant since approximately October 2015 and held a balance of less than $500 before the deposit.

49. Although Younis had not accessed his online brokerage account since October 2015, he logged-in to his brokerage account 11 times on July 19 and July 20.

50. On July 19 and 20, 2016, Forte and Younis also spoke on the phone two times.

51. On July 21, 2016, at approximately 11:30 am EDT, Forte called his Brother's work number and the two spoke briefly.

52. Between 12:38 pm and 1:12 pm EDT that day, a number registered to Forte's part-time employer called Younis three times.

53. At approximately 1:16 pm EDT on the same day, July 21, 2016, Younis called his brokerage firm and told the representative that he had attempted to purchase Linear call options online but had received an error message.

54. The representative told Younis the funds from his deposit had not yet settled.

55. The representative nevertheless approved the trade and entered Younis's order to purchase 35 Linear call options with an expiration date of August 19 and a strike price of $48. Linear's stock had traded between $47.79 and $48.49 on July 21, 2016.

56. On July 22, 2016, at approximately 7:11 am EDT, Forte and Younis again spoke on the telephone.

57. At approximately 12:05 pm EDT that day, Younis purchased 1,100 shares of

Linear stock.

58. On July 26, 2016, Forte and Younis called each other at least six times, both before and after the merger announcement.

59. On July 26, 2016, at 2:47 pm EDT, NASDAQ halted trading in Linear stock after press reported rumors of a merger and Linear's stock price increased to $62.79.

60. At approximately 2:55 pm EDT, on July 26, 2016, Younis placed an order to sell the Linear call options in his account. The order did not execute.

61. At 3:35 pm EDT that afternoon, Analog and Linear issued a press release announcing the merger.

62. On July 27, 2016, at approximately 9:33 am and 9:44 am EDT, Younis sold the Linear call options and stock in his account for a total profit of $51,725.59.

**D.     Forte Tipped Manning about Linear's Merger.**

63. As discussed above, Forte, Younis and Manning were close friends and grew up together and Manning, Forte, and Younis traveled to Martha's Vineyard in the summer of 2016.

64. Manning knew Forte's Brother and knew that he was an executive at Analog.

65. Manning had previously bought Linear stock in 2009 and 2013, but those purchases were significantly smaller than Manning's 2016 purchases.

66. In breach of the duty of trust and confidence Forte owed to his Brother, Forte misappropriated Linear merger information that he obtained from his Brother prior to Linear's and Analog's release of the information to the public. After obtaining material nonpublic information about the merger from his Brother, Forte tipped Manning about that information during conversations that took place before Manning purchased Linear securities in July 2016.

67. Between July 22, 2016 and July 26, 2016, Manning purchased a total of 3,000

shares of Linear stock in his and his wife's trading accounts.

68. According to Manning, he bought Linear stock on the basis of tips from Forte, which Forte described as a "good bet" and implied a merger between Analog and Linear.

69. Manning gave weight to Forte's recommendation because he knew that Forte's Brother worked at Analog and understood that the information had come from him.

70. After the initial recommendation, Manning and Forte had "confidence building conversations" on the telephone in which Forte advised Manning that everything still looked good.

71. On July 21, 2016, at approximately 9:00 pm EDT, Forte called Manning.

72. Forte called a phone number subscribed to Manning's spouse, which Manning had listed as his primary contact number for his brokerage account, and which Manning's spouse had not listed as any of her contact numbers for her brokerage account.

73. Forte's next call, at approximately 9:01 pm EDT that same evening, was to his Brother. Thereafter, Forte and his Brother exchanged multiple phone calls, with the last call occurring at approximately 9:32 pm EDT.

74. On Friday, July 22, 2016, at approximately 8:21 am EDT and 9:40 am EDT, Forte again called Manning at the same number.

75. Two minutes after the second phone call, at approximately 9:42 am EDT, Manning bought 1,000 shares of Linear stock in his own brokerage account.

76. On Monday, July 25, 2016, at approximately 10:57 am EDT, Manning bought 750 shares of Linear stock in his own brokerage account.

77. On July 26, 2016, at approximately 7:50 am EDT, Forte called Manning and the two talked for several minutes.

78. At approximately 9:38 am EDT, Manning bought 500 shares of Linear stock in his own brokerage account.

79. At approximately 10:30 am EDT, Forte called Manning again.

80. At approximately 11:30 am EDT, Manning called Forte.

81. At approximately 12:04 pm EDT, Manning purchased 750 shares of Linear stock in his wife's brokerage account.

82. At 3:35 pm EDT, on July 26, 2016, Analog issued a press release announcing the merger.

83. Forte called Manning four times between 3:59 pm and 6:30 pm EDT, on July 26, 2016.

84. On July 27, 2016, at approximately 9:38 am EDT, Manning sold the Linear stock in his and his wife's brokerage accounts, realizing profits of $34,814.63.

85. Manning paid Forte several thousand dollars in cash several weeks after the merger was announced, withdrawing the money when he deposited a bonus check from his employer.

86. When Manning handed Forte the cash, Manning said "good trade," or something similar, and David Forte understood the payment was in return for the tip.

E.   **Younis Recommended Linear Stock to the Associate.**

87. Younis had a business relationship with an Associate (the "Associate").

88. As of July 2016, the Associate had limited investment history, and had no prior history of purchasing Linear stock or options.

89. Younis and the Associate had general discussions about investing and the Associate asked Younis to share stock tips.

11

90. On July 22, 2016, between 11:30 am and 2:02 pm EDT, Younis and the Associate called each other four times.

91. Younis recommended that the Associate buy Linear stock and suggested that he was confident the stock price would rise quickly.

92. The Associate also knew Younis had purchased Linear securities.

93. The Associate then contacted a representative of his brokerage firm.

94. According to the representative's notes of the call on July 22, 2016, the Associate said "he was talking to a buddy and heard about LLTC."

95. The Associate asked the representative if he could place the trade even though he did not have funds in his brokerage account.

96. The representative told the Associate he could place the trade provided he deposited the funds before the trade settled the following Wednesday, July 27, 2016.

97. At approximately 2:06 pm EDT, on July 22, 2016, the representative entered an order to purchase 1,000 shares of Linear stock in the Associate's account.

98. On July 27, 2016, the Associate sold his Linear stock, realizing profits of $11,016.88.

**CLAIM FOR RELIEF**

**Violations of Section 10(b) of the Exchange Act
and Rules 10b-5 Thereunder**

99. The Commission realleges and incorporates by reference paragraphs 1 through 98, as though fully set forth herein.

100. All of the Linear shares and call options that Younis, Manning, and the Associate purchased are securities.

101. Forte misappropriated material nonpublic information that he obtained from his

Brother about the Linear merger by tipping Younis and Manning so that they could trade Linear securities. Forte knew or recklessly disregarded that the information he obtained was material and nonpublic. Forte also knew or recklessly disregarded that by tipping Younis and Manning, he breached a duty or a similar relationship of trust and confidence owed to his Brother.

102. Forte received a personal benefit from his tips to Younis and Manning, including but not limited to a cash payment from Manning and the benefit of providing gifts to close personal friends.

103. Younis and Manning purchased Linear securities based on the tips that they received from Forte. Younis and Manning knew, or recklessly disregarded the fact, that the tips Forte shared with them were based on material nonpublic information. Younis and Manning also knew, recklessly disregarded the fact, and/or should have known that Forte conveyed the material nonpublic information to them in a breach of a fiduciary duty, or a similar obligation arising from a relationship of trust and confidence, and that Forte received a personal benefit in return for tipping the information.

104. Forte, Younis, and Manning knew, or recklessly disregarded the fact, that it would be improper for Younis and Manning to purchase Linear securities based on material nonpublic information Forte obtained from his Brother.

105. As more fully described in paragraphs 1 through 98, Forte, Younis, and Manning, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce, or of the mails, or of any facility of any national securities exchange, directly or indirectly: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading;

and (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other another person, including purchasers and sellers and prospective purchasers and sellers of securities.

106. Forte, Younis, and Manning acted with scienter in that they knowingly or recklessly engaged in the insider trading described above.

107. By reason of the conduct described above, Defendants, directly or indirectly, violated and, unless enjoined will again violate, Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

108. Defendants' conduct charged herein occurred within any statute of limitations (as tolled by agreements) that may be applicable to any claims or relief sought in this Complaint.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court grant the following relief:

### I.

Enter a Final Judgment permanently restraining and enjoining Defendants and their agents, servants, employees and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

### II.

Enter a Final Judgment directing Defendants to pay civil monetary penalties pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-1];

### III.

Grant such other and further relief as this Court may deem just and proper.

## JURY DEMAND

The Commission demands a jury in this matter for all claims so triable.

Respectfully submitted,

Dated: January 19, 2022

/s/ Alyssa A. Qualls
Alyssa A. Qualls (IL Bar No. 6292124)
Email: Quallsa@sec.gov
Michael Foster (IL Bar No. 6257063)
Email: Fostermi@sec.gov
Brian D. Fagel (IL Bar No. 6224886)
Email: Fagelb@sec.gov
Peter Senechalle (IL Bar No. 6300822)
Email: Senechallep@sec.gov

*Attorneys for Plaintiff*
*United States Securities and Exchange Commission*

175 West Jackson Blvd., Suite 1450
United States Securities and Exchange Commission
Chicago, Illinois 60604
Telephone: (312) 353-7390
Facsimile: (312) 353-7398